J-S44014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RAHEIM RIGGINS, | |
| Appellant | No. 37 EDA 2016 |

Appeal from the Judgment of Sentence Entered November 6, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):
CP-51-CR-0011009-2013
CP-51-CR-0012347-2013
CP-51-CR-0012349-2013
CP-51-CR-0012351-2013
CP-51-CR-0012352-2013
CP-51-CR-0013662-2013

BEFORE: BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED DECEMBER 01, 2017**

Appellant, Raheim Riggins, appeals from the judgment of sentence of an aggregate term of 36 to 72 years' incarceration, imposed after he was convicted of numerous offenses in six separate cases, including, *inter alia*, rape, aggravated assault, unlawful restraint, indecent assault, burglary, criminal conspiracy, and carrying a firearm without a license. On appeal, Appellant challenges the sufficiency and weight of the evidence to sustain his convictions, as well as discretionary aspects of his sentence. After careful review, we find no merit to these claims. However, we *sua sponte* determine that the trial court's November 6, 2015 order that deems Appellant a Sexually

Violent Predator (SVP) under the Sexual Offender Registration and Notification Act (SORNA), 42 Pa.C.S. §§ 9799.10-9799.41, is illegal. Therefore, we vacate in part, affirm in part, and remand for further proceedings.

The trial court set forth a lengthy summary of the facts and procedural history of Appellant's case, which we need not reproduce herein. **See** Trial Court Opinion (TCO), 10/11/17, at 1-17. We only briefly note that Appellant was charged with various offenses in six separate cases that were ultimately consolidated for trial. On February 4, 2015, a jury convicted him of multiple counts of robbery and conspiracy, as well as single counts of rape, aggravated assault, burglary, unlawful restraint, indecent assault, carrying a firearm without a license, and carrying a firearm on a public street in Philadelphia. For these offenses, Appellant was sentenced to the aggregate term stated *supra*. He was also determined to be an SVP, which carries a mandatory lifetime registration requirement under SORNA. **See** 42 Pa.C.S. § 9799.15(a)(6).

Following Appellant's conviction and sentencing, he filed timely post-sentence motions in each case. Those motions were ultimately denied, and Appellant filed timely notices of appeal in each case. The trial court then directed Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Problematically, Appellant chose to file six **different** (albeit very similar) Rule 1925(b) statements in each of his cases. Apparently, the trial court did not realize that Appellant was filing multiple concise statements. While the court ultimately drafted a well-reasoned and detailed

opinion, *see* Trial Court Original Opinion (TCOO), 10/5/16, it inadvertently erred by concluding that Appellant had waived his sufficiency of the evidence claim(s) based on the single Rule 1925(b) statement the court assessed. More significantly, the court also did not address two weight-of-the-evidence issues raised by Appellant in the cases pertaining to victims J.H. and Earle Wilson.[1]

Consequently, we were constrained to issue a judgment order remanding Appellant's case for the trial court to draft a new opinion. We directed the court to address the following five issues raised by Appellant on appeal (which we determined were preserved through our examination of Appellant's six post-sentence motions and six Rule 1925(b) statements):

> 1. Whether the evidence was insufficient to sustain a verdict of guilty [in the cases involving Ms. Hawkins, Mr. Wilson, and J.B.K.,] where the victims were unable to identify [Appellant] as the person who committed the crimes[?]
>
> 2. Whether the verdict was against the weight of the credible evidence where[,] although a statement was read into the record from Appellant regarding his supposed involvement in the robbery of Earle Wilson, there was no other valid independent or corroborating evidence[?]
>
> 3. Whether the verdict was against the weight of the credible evidence in that[,] although a statement was read into the record from [Appellant] regarding his supposed involvement in the robbery and assault of J.B.K., there was no DNA analysis, no identification or other independent or corroborating evidence[?]
>
> 4. The verdict was against the weight of the credible evidence in that[,] although a statement was read into the record from [Appellant] regarding his supposed involvement in the sexual

---

[1] To avoid such confusion in the future, Appellant's counsel should consolidate all claims in one post-sentence motion and one Rule 1925(b) statement.

assault of Ms. Hawkins, the lack of identification along with the DNA evidence at trial showed otherwise.

5. Whether the trial court imposed an illegal, excessively punitive sentence where [the] aggregate sentence (36 to 72 years) amounts to a life sentence for [] Appellant and Appellant received an illegal sentence on the indecent assault[?] The [c]ourt failed to consider the guidelines in fashioning an appropriate sentence and failed to provide adequate reasons on the record.

Appellant's Brief at 7-8.

On October 11, 2017, the trial court filed a new Rule 1925(a) opinion addressing the above-stated claims. Preliminarily, the trial court "observed that, notwithstanding the Superior Court's Judgment Order, … the above [sufficiency and weight of the evidence] issues – *which were never presented to the [c]ourt at any point* – are waived on appeal." TCO at 18 (emphasis in original). According to the trial court, only one of Appellant's Rule 1925(b) statements was properly served on the court and, thus, the issues raised in his other five Rule 1925(b) statements are waived. *Id.*

After carefully examining the six certified records before us (one for each of Appellant's six consolidated cases), we are compelled to reject the trial court's waiver decision. We stress that our appellate review is always limited to the certified record before us. *See Bennyhoff v. Pappert*, 790 A.2d 313, 318 (Pa. Super. 2001) (stating "[i]t is black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the record in [the] case"). Nothing in the records in this case confirms that Appellant only served the trial court with one Rule 1925(b) statement; rather, each certified record contains a unique Rule 1925(b) statement (pertaining to the specific

victim in the case), and each concise statement has attached to it a Certificate of Service indicating that the document was served on the trial court on June 8, 2016. Notably, in drafting our previous Judgment Order, we had no way of knowing that only *one* Rule 1925(b) statement was actually served on the trial court; accordingly, given the fact that Appellant filed a Rule 1925(b) statement, and a Certificate of Service, in each separate case, we deemed the above-stated issues preserved for our review. Based on this record, we will not now, in hindsight, change our determination that Appellant's above-stated issues were adequately preserved pursuant to Rule 1925(b).

Notwithstanding the trial court's decision that Appellant's sufficiency and weight-of-the-evidence claims are waived on this basis, the court provides a well-reasoned, alternative analysis of the merits of those issues. *See* TCO at 19-24. Having reviewed the certified record, the briefs of the parties, and the applicable law, we conclude that the trial court's discussion of those claims is sound, and we adopt the court's rationale as our own in rejecting Appellant's weight and sufficiency issues.

Additionally, we conclude that the analysis set forth by the trial court in its original opinion filed on October 5, 2016, appropriately and completely addresses the sentencing arguments that Appellant presents on appeal. *See* TCOO at 21-25. Therefore, we adopt that portion of the court's October 5, 2016 opinion as our own in rejecting Appellant's discretionary aspects of sentencing claim.

However, we are compelled to *sua sponte* vacate an illegal aspect of Appellant's sentence, namely, the November 6, 2015 sentencing order deeming him an SVP. **See Commonwealth v. Butler**, No. 1225 WDA 2016, *6 (Pa. Super. filed Oct. 31, 2017) (concluding that the issue discussed, *infra*, implicates the legality of a defendant's sentence). In **Commonwealth v. Muniz**, 164 A.3d 1189 (Pa. 2017), our Supreme Court held that the registration requirements under SORNA constitute criminal punishment, thus overturning prior decisions deeming those registration requirements civil in nature. **Id.** at 1218. On October 31, 2017, this Court ruled that,

> since our Supreme Court has held [in **Muniz**] that SORNA registration requirements are punitive or a criminal penalty to which individuals are exposed, then under **Apprendi** [**v. New Jersey**, 530 U.S. 466 (2000),] and **Alleyne** [**v. United States**, 133 S.Ct. 2151, 2163 (2013)], a factual finding, such as whether a defendant has a "mental abnormality or personality disorder that makes [him or her] likely to engage in predatory sexually violent offenses[,]" 42 Pa.C.S.[] § 9799.12, that increases the length of registration must be found beyond a reasonable doubt by the chosen fact-finder. Section 9799.24(e)(3) identifies the trial court as the finder of fact in all instances and specifies clear and convincing evidence as the burden of proof required to designate a convicted defendant as an SVP. Such a statutory scheme in the criminal context cannot withstand constitutional scrutiny.

**Butler**, No. 1225 WDA 2016, at *11. Accordingly, the **Butler** panel held that 42 Pa.C.S. § 9799.24(e)(3) is unconstitutional. **Id.** at *11-12.

In light of **Butler**, we are compelled to conclude that the portion of the November 6, 2015 sentencing order deeming Appellant an SVP is illegal. **See id.** at *12. Accordingly, we vacate that portion of the sentencing order, and remand Appellant's case for the trial court to determine under what tier of

SORNA Appellant must register, and to provide him with the appropriate notice of his registration obligations under 42 Pa.C.S. § 9799.23. *See id.* at *13.

Portion of sentencing order deeming Appellant an SVP vacated. Judgment of sentence affirmed in all other respects. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/1/2017

TCOO

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-51-CR-0011009-2013
    :     CP-51-CR-0012347-2013
VS.     :     CP-51-CR-0012349-2013
    :     CP-51-CR-0012351-2013
RAHEIM A. RIGGINS a/k/a     :     CP-51-CR-0012352-2013
RAHEEM RIGGENS a/k/a     :     CP-51-CR-0013662-2013
RAHEEM RIGGINS a/k/a     :
RAHEIMA RIGGINS a/k/a    
RAHIEM RIGGINS a/k/a
RAHIM AKBARR a/k/a
RAHIM RIGGINS

CP-51-CR-0011009-2013 Comm. v. Riggins, Raheim A.
Opinion

|||||||||||||||||||||||||||
7508367571

37 EDA 2016

OPINION

**FILED**

OCT 05 2016

Appeals/Post Trial
Office of Judicial Rec(

SCHULMAN, S.I., J.

Raheim A. Riggins ("Appellant") has appealed this Court's judgment of conviction and sentence. This Court submits the following Opinion in accordance with the requirements of Pa. R.A.P. 1925, and for the reasons set forth herein, recommends that its judgment be affirmed.

PROCEDURAL HISTORY

On February 4, 2015, following a jury trial before this Court, Appellant was convicted of: five (5) counts of Robbery; one (1) count each of Rape, Aggravated Assault, Burglary, Unlawful Restraint, Indecent Assault, Firearms Not to Be Carried without a License, and Carrying Firearms on Public Streets in Philadelphia; and ten (10) counts of Criminal Conspiracy (to commit Robbery (5), Rape, Aggravated Assault, Burglary, Unlawful Restraint, and Indecent Assault).

On November 6, 2015, upon review of the pre-sentence investigation report and consideration of all relevant facts and circumstances of this case, this Court sentenced Appellant to an aggregate term of 36 to 72 years' incarceration. He subsequently appealed, and this Court

ordered him to file a Concise Statement of Matters Complained of on Appeal in accord with Pa.R.A.P. 1925(b). Counsel for Appellant timely complied.

FACTUAL HISTORY

At trial, the Commonwealth first called Philadelphia Police Officer Andrew Revucky to the stand. Officer Revucky testified that, on March 20, 2013 at approximately 3:00 a.m., he received a radio call which took him to 2307 Clearfield Street in Philadelphia. There, he encountered complainant J.H. ▓▓▓▓▓, who was "very distraught, crying, very upset", and stated that she had just been raped, beaten and burglarized by two black males. Specifically, she said she heard and saw two black males come into her home wearing all black clothing, shining flashlights; they held her down by her neck, bound her wrists and raped her. They also removed numerous items of value and cash from her home. She eventually was able to free herself after they left, and went to her neighbor's house to call police. (See N.T. 01/29/15, pp. 30-35).

Next, the Commonwealth presented the testimony of complainant J.H. ▓▓▓▓▓. J.H. ▓▓▓▓▓ testified that, in the early morning hours March 20, 2013, she was asleep in her bed inside her home at 2303 Clearfield Street in Philadelphia, when she heard two men inside her home. J.H. ▓▓▓▓▓ was 62 years old at the time. The men came upstairs with flashlights and yelled, "This is the Fire Department". She jumped out of bed and screamed, at which point one of them hit her in the head with a flashlight. One of the males then grabbed her forcefully by the throat while the other tried to put a pillow over her face. J.H. ▓▓▓▓▓ desperately wriggled free and said, "Please don't kill me. Please don't kill me." One of the males ordered her to put her hands behind her back; they then tied her hands together with the belt from her bathrobe, tied thermal pants around her mouth, and held her face down. (See N.T. 01/29/15, pp. 37-46, 77-78).

2

While one of the males was ransacking through her belongings, the other pulled down her pajama bottoms, and tried to insert his penis into her anus. It did not go all the way in, so he flipped her over onto her back, lifted up her legs, and again inserted his penis into her anus. After a while, he flipped her over again onto her stomach, rubbed "something hot" on/around her genitals, and then left the room. (See N.T. 01/29/15, pp. 44-52, 60).

Paralyzed from fear, and physically bound, J.H. lay in her bed for 20 minutes, until it was "really quiet". She then wriggled her hands free, and removed the binding from her mouth. She went downstairs and saw that both her back and front doors were wide open. She grabbed her keys, ran to her neighbor's house at 2307 Clearfield Street, and called police. After describing the above events to responding police officers, J.H. was transported to Episcopal Hospital for a rape kit and medical treatment. She was observed to have a tear to her anus, a swollen cheek, and a bruised forehead. (See N.T. 01/29/15, pp. 47, 51-53, 56-57, 61-62).

J.H. also testified that the intruders had taken her jewelry, two (2) flat screen televisions, her cell phone, a digital camera, her wallet with $80 cash, and all her identification and credit cards. She also noted that she had locked her doors before going to bed that night. (See N.T. 01/29/15, pp. 41, 53-56).

Philadelphia Police Detective Thomas Martinka testified next for the Commonwealth. Detective Martinka testified that, on March 20, 2013 at approximately 3:00 a.m., he was assigned to investigate the robbery and sexual assault of J.H. Upon receiving the assignment, he and his partner, Detective Taylor, went to Episcopal Hospital to interview J.H. After recording a detailed description of the events, the detectives then went to J.H.'s home, which was being "held" by uniformed police officers as a crime scene. There, Detectives Martinka and Taylor took photographs of the scene and collected various pieces of evidence,

3

including J.H. ~~[redacted]~~ purse, pillow case, robe, robe tie, and bed quilt -- all of which were secured under property receipt for chemical (DNA) analysis. Additionally, Detective Martinka testified that his Crime Scene Unit attempted to lift fingerprints from various locations inside the home. (See N.T. 01/29/15, pp. 80-89).

The Commonwealth next called complainant Christopher Darrell Chandler to the stand. Mr. Chandler testified that on July 26, 2013, at approximately 3:00 a.m., he was on his way home from work, walking westbound on the 2600 block of Lehigh Avenue, when he was approached by two black males. One of the males was approximately six feet (6') tall with a lighter complexion and medium build, and the other was shorter, approximately five feet, seven inches (5'7") tall with a darker complexion and stocky build. When the males were a few feet from him, Mr. Chandler saw that the shorter male was holding and pointing a gun below his waist. He ordered Mr. Chandler to "stand right there." Mr. Chandler complied, and the taller male then walked behind him and started rifling through his pockets. The males then ordered him to walk around the corner with them, where it was darker. There, they went through his wallet, retrieved his debit card and asked for his PIN; Mr. Chandler complied. The taller male took the card to an ATM, while the shorter male continued to hold Mr. Chandler at gunpoint. When the taller male returned, they told Mr. Chandler to "take a walk and don't look back". He walked straight home and called police. (See N.T. 01/29/15, pp. 92-101).

When police arrived, Mr. Chandler declined to go looking through the area for his attackers because he was "too shaken up". Instead, he went to Central Detectives for an interview, during which he provided a detailed physical descriptions of his assailants. Mr. Chandler subsequently was shown a photo array at his home, from which array he positively

4

identified Appellant as his assailant. He also positively identified Appellant in court. (See N.T. 01/29/15, pp. 102-111).

Forensic Nurse Examiner Jenny Smith took the stand next for the Commonwealth. Nurse Smith testified that, on March 20, 2013 at approximately 6:50 a.m., she examined J.H. at the Sexual Assault Response Center. Nurse Smith testified that during the examination, J.H. reported a sexual assault that also involved a weapon, hitting, grabbing, pushing, gagging, strangulation, being tied up, and verbal threats. More specifically, she had been hit with a flashlight, gagged with her own thermal pants, had her hands tied behind her back, and reported both vaginal and anal penetration by penis. (See N.T. 01/29/15, pp. 122-134).

Nurse Smith observed the injuries to J.H.:

> On the external of her vagina, I did note that she had a tear in an area called the posterior fourchette as well as tenderness. I noted that she had tenderness to the perineum, anus, as well as a tear on her anus. ... [On the inside of her vagina,] I noted that she had bruising to the left and the right vaginal walls [and] that she also had internal tenderness to both vaginal walls and the cervix as well.

(See N.T. 01/29/15, p. 137). Additionally, Nurse Smith observed various injuries to J.H.'S person, including: abrasions and lacerations to her mouth (upper and lower lips); abrasions, tenderness and a laceration to her neck; an abrasion to her left hand; and a contusion to her right knee. Nurse Smith also took numerous photographs of J.H.'S injuries. (See N.T. 01/29/15, pp. 134-136, 139).

Nurse Smith further noted that J.H. consented to multiple antibiotics to prevent STDs, Plan B contraceptive, and HIV prevention medication. Finally, in addition to drawing J.H'S

5

▓▓▓▓▓ blood for a DNA reference sample, Nurse Smith collected swabs of her internal and external vagina, rectal area and perineum. (See N.T. 01/29/15, pp. 138-140).

The Commonwealth next presented the testimony of complainant Gregory K. Johnson. Mr. Johnson testified that, on July 26, 2013 at approximately 4:45 a.m., he was on his way to work, walking westbound on the 2600 block of Lehigh Avenue, when he was approached by two black males. One of the males was approximately five feet, seven inches (5'7") tall and dark skinned, and the other was approximately six feet, one inch (6'1") tall with a lighter complexion; both males were holding black handguns. The shorter male grabbed Mr. Johnson by the jacket and said, "Get over there." The taller male pressed his handgun against Mr. Johnson's head and said, "You heard what he said. Get over there." They pulled him over to a parked white van, where the shorter male went through his pockets, while the taller male held his gun against Mr. Johnson's head, and repeatedly stated, "I should shoot you." (See N.T. 01/29/15, pp. 143-149, 156-158).

The bandits made off with Mr. Johnson's necklace, $800 cash from his wallet,[1] two cell phones (one of which was for his job), $132 cash from his pants pocket, cigarettes and eyeglasses. The altercation ended when the shorter male discarded Mr. Johnson's wallet to the ground, and told him to "stay facing one direction", at which time the males ran in the opposite direction. Without a phone, Mr. Johnson then proceeded to retrieve his work truck and returned to Lehigh Avenue, where he found a police car sitting at the intersection of 26th and Lehigh. Upon giving a description to police, he reported to work (because if he did not show up for work, he would not get paid). (See N.T. 01/29/15, pp. 149-154).

---

[1] Mr. Johnson was carrying the cash because he was going to buy a present for his daughter's upcoming birthday. (See N.T. 01/29/15, p. 150).

On August 5, 2013, detectives interviewed Mr. Johnson at his home, during which he described the robbery and provided a detailed physical description of his attackers. On the same date, Mr. Johnson positively identified both Appellant and Co-Defendant Hashiem Clark, from respective photo arrays, as his assailants. Mr. Johnson also positively identified Appellant and Co-Defendant Clark in court. (See N.T. 01/29/15, pp. 154-161).

Complainant Earle Wilson also testified at trial. Mr. Wilson testified that, on July 21, 2013 at approximately 4:20 a.m., he was walking to work on North 29th Street at its intersection with York Street, when he noticed two black males crossing the street and walking toward him. One of the males was shorter with a dark complexion, and the other male was taller with a lighter complexion. As they neared Mr. Wilson, the shorter male stated, "What are you looking at?" Mr. Wilson responded, "Nothing. I'm messing with my keys." The shorter male replied, "I don't like the way you said that", and then the males set in on him. The shorter male retrieved a black handgun from his waistband and pressed it against Mr. Wilson's chest, while the taller male went through his pockets. The males were standing side-by-side and facing Mr. Wilson. They took his wallet, which contained $26, his SEPTA TransPass, bank card, Social Security card, and birth certificate, among other things. The males then told Mr. Wilson to walk away; he complied. He walked back to his home, and feeling very upset, told his wife he had just been robbed. Mr. Wilson reported the robbery later that day after work. He was interviewed by detectives at his home on August 14, 2013, at which he gave a detailed account of the above events. He was shown photo arrays but not able to make a positive identification. However, he positively identified Appellant and Co-Defendant Clark both at the preliminary hearing and at trial, as his assailants. (See N.T. 01/30/15, pp. 9-49).

7

Next, the Commonwealth called complainant Alexander Smith to the witness stand. Mr. Smith testified that, on August 2, 2013 at approximately 3:30 a.m., he was walking on North 16th Street approaching Susquehanna Avenue, when two black males walked past him. He continued walking for another half block, at which time the same two males ran up from behind, grabbed him and pushed him against a parked trailer. Mr. Smith testified that he was then struck in the back of the head with an object, and then punched in the face. One of the males, whom he identified as Appellant, pressed a gun against his right side, while the other "tall, black" male went through his pockets. Appellant and his cohort took Mr. Smith's wallet, which contained his identification, debit and credit cards, and also took his iPod and car keys. They then told him to run, and Mr. Smith complied. He saw some kids sitting on a front porch on Diamond Street and borrowed their phone to call police. After providing a description to the responding police officer, he was transported to Central Detectives for an interview. Approximately one week later, Mr. Smith was shown photo arrays, from which he positively identified Appellant. He also positively identified Appellant in court. (See N.T. 01/30/15, pp. 50-68).

The Commonwealth next presented the testimony of complainant J.B.K., a minor. J.B.K. testified that, on July 24, 2013 at approximately 11:00 p.m., she was walking on the 2600 block of North 22nd Street, when she was approached by two black males -- one of whom was short and dark-skinned, and the other was tall. The taller male pulled out a black handgun, which resembled "a police gun", and the shorter male instructed, "Grab her, get her up, take her across the street"; the taller man obliged, grabbing J.B.K. by the back of the neck and pushing her across the street. The taller male grabbed her purse and emptied its contents on the sidewalk. The shorter male then pulled J.B.K. -- then just 15 years old -- into an adjacent alley, removed her pants, reached beneath her underwear, and fondled her vagina. When the taller man appeared

8

and announced that he was "done", the males escorted J.B.K. out of the alley and told her to go back where she came from and that "if [she] called the police, it was not going to be nice." (See N.T. 01/30/15, pp. 81-95).

J.B.K. walked away and, after waiting until she was at a safe distance, borrowed a pedestrian's cell phone to call police. Police arrived immediately; upon describing what had just happened, she was transported to the Special Victim's Unit ("SVU"), where she was interviewed by a female detective. Among other things, she described the physical characteristics and clothing of the shorter male as: "African American, early 20s, dark skinned, short[,] bald, and had a beard. He was wearing gray shorts and black sneakers." She described the second male as: "African American, early 20s, tall". (See N.T. 01/30/15, pp. 96-99).[2]

Philadelphia Police Detective James Waring testified next for the Commonwealth. Detective Waring testified that, along with his partner, Detective Ralph Domenic, he is a member of Central Detectives' Special Investigative Unit, and works exclusively on robberies. As part of his work, Detective Waring reviews all robbery complaints that come in, in order to look for "patterns" -- e.g., similar incidents, in the same areas, similar descriptions of the offenders, weapons used, et cetera. (See N.T. 01/30/15, pp. 136-139).

Detective Waring observed one such pattern in a specific set of robberies in July and August 2013:

> In each of the robberies there were two black males. The
> descriptions for most of them were taller black male and a shorter

---

[2] The Commonwealth next called Philadelphia Police Officer Andrew McCrea, Detective Keenya Taylor, and Detective Linda Pace, respectively. Officer McCrea testified that he responded to the above incident concerning J.B.K., prepared the initial (75-48) report, and ultimately transported J.B.K. to the SVU. Detective Taylor testified that she interviewed J.B.K. at the SVU on the night of the attack. Detective Pace testified that, on August 8, 2013, she conducted a follow-up interview of J.B.K. at her residence for the purpose of presenting a photo array, but J.B.K. was unable to make an identification. (See N.T. 01/30/15, pp. 114-134).

9

black male. They were occurring, for the most part, along Lehigh Avenue and maybe a couple blocks south of there with handguns. A lot of them -- well, most of them were after midnight and then up until 3:00 or 4:00 in the morning. So that's what -- I mean, we recognized the pattern pretty easily.

(N.T. 01/30/15, p. 139).

Detective Waring testified that the above pattern applied to the robberies of Christopher Chandler, Gregory Johnson, Earle Wilson, Alex Smith, and J.B.K. Accordingly, he canvassed the area looking for surveillance videos, and was able to find a couple from neighborhood stores. The videos, which were shown to the jury, depicted two males walking to/from the robberies of Mr. Chandler and Mr. Johnson (Mr. Johnson also appeared in one the videos as he was being robbed). The same two males were wearing the same clothes in both videos; they matched the descriptions as reported by Mr. Chandler and Mr. Johnson; and were traveling in the direction consistent with said reports. Still images of the males also were shown to the jury. Detective Waring testified that he attempted, but could not find, surveillance videos pertinent to the robberies of Earle Wilson, Alex Smith and J.B.K. (See N.T. 01/30/15, pp. 143-158).

Detective Waring testified that, consistent with police protocol, he posted the videos on YouTube. Information subsequently received from viewers, led him to follow up with Mr. Johnson at his residence on August 5, 2013. Detective Waring presented him with a photo array, from which Mr. Johnson positively identified Appellant as one of his assailants. Later that day, Detective Waring obtained and executed a warrant to search Appellant's home. Appellant was not home; however, Detective Waring encountered a woman by the name of Sharita Gaines, who was in possession of proceeds from one of the robberies, to wit, Mr. Smith's iPod (as confirmed by Mr. Smith per its contents). The iPod was recorded on a property receipt and returned to Mr. Smith. (See N.T. 01/30/15, pp. 159-165).

10

Detective Waring transported Ms. Gaines to Central Detectives for an interview. As a result of the interview, he developed a second suspect -- Co-Defendant Clark. Accordingly, he met with Mr. Johnson and presented him with a second photo array that included Co-Defendant Clark. Mr. Johnson positively identified Co-Defendant Clark as the other male who had robbed him. Detective Waring thereafter presented photo arrays to Mr. Chandler, who positively identified Appellant as his assailant; Mr. Chandler was unable to identify Co-Defendant Clark from the second array. (See N.T. 01/30/15, pp. 165-170).

Detective Waring obtained arrest warrants for Appellant and Co-Defendant Clark, the latter of whom was taken into custody first. Co-Defendant Clark consented to a formal interview on August 13, 2013. In his interview, Co-Defendant Clark provided detailed accounts of the robberies of Messrs. Johnson, Chandler, Smith and Wilson; he admitted to committing these robberies with the "same guy" each time. (See N.T. 01/30/15, pp. 189-198).

Early the next day, August 14, 2013, Appellant attempted to turn himself in at a Federal Immigration Custody Enforcement (ICE) building. Police were notified and he was taken into custody; on the same date, Appellant agreed to be interviewed. Appellant provided detailed accounts of the robberies of Messrs. Johnson, Chandler, Smith and Wilson, which he admitted to committing with the same "other guy". (See N.T. 01/30/15, pp. 199-218).

Detective Waring also testified that as part of the intake process, the height and weight of arrestees are recorded. In that regard, at the time of their respective arrests, Appellant was five feet, seven inches (5'7") tall and weighed 155 pounds, and Co-Defendant Clark was six feet (6') tall and weighed 195 pounds. (See N.T. 02/02/15, pp. 7-8).[3]

---

[3] The Commonwealth next presented the expert testimony of Deanna Zarzecki, a forensic scientist with the Philadelphia Office of Forensic Science. Ms. Zarzecki testified that she was asked to analyze various items collected under property receipt from ▓▓▓▓▓▓▓ residence,

J.H.'S

11

The Commonwealth also called its expert DNA analyst, Gregory Van Alstin, to the stand. Mr. Van Alstin, who works in the DNA lab at the Philadelphia Office of Forensic Science, testified that he conducted DNA comparison analyses of samples from the items collected at J.H.'s ████ residence. Specifically, Mr. Van Alstin extracted DNA profiles from the collected items and compared them with the known DNA profiles of J.H. ████, Co-Defendant Clark, and Appellant. Based on his analysis, Mr. Van Alstin was able to determine that J.H.'s ████ robe tie had one major DNA contributor -- J.H. ████ -- along with two minor contributors. While the DNA from the minor contributors was insufficient to render a conclusive determination, Mr. Van Alstin was able to conclude that at least one of the minor contributors was a male. Further, Mr. Van Alstin was able to determine that both Appellant and J.H. ████ were <u>equal</u> <u>contributors</u> to the shoulder strap/zipper of J.H.'s ████ handbag. Mr. Van Alstin issued these findings to a reasonable degree of scientific certainty (See N.T. 02/02/15, pp. 62-73, 77-79).[4]

Next, the Commonwealth called Sharita Gaines to the stand. Ms. Gaines testified that she had been Appellant's girlfriend since 2011, and still was his girlfriend at the time of trial. Ms. Gaines testified that during the period of March to August 2013, she recalled seeing Appellant and Co-Defendant Clark together periodically. In August 2013, Philadelphia Police Detectives searched her house, at which time they recovered an iPod from her purse. Ms. Gaines testified that she had obtained the iPod from Appellant. On the same date of the search, she was taken to

---

for the presence of: (1) acid phosphatase (an enzyme present in seminal fluid); (2) P-30 (a protein found in seminal fluid); and (3) sperm. Ms. Zarzecki was unable to detect the presence of any of the above substances. (See N.T. 02/02/15, pp. 35-59).

[4] Mr. Van Alstin observed that the remaining samples that he tested either contained data that was insufficient for comparison or no inclusions for Appellant or Co-Defendant Clark. (See N.T. 02/02/15, p. 79).

Central Detectives for an interview, at which time she was shown two surveillance videos from the robberies; Ms. Gaines identified Appellant and Co-Defendant Clark in the surveillance videos. Ms. Gaines also positively identified Appellant and Co-Defendant Clark from another surveillance video shown at trial. Finally, Ms. Gaines admitted to observing a flat screen television in her home that she had not seen before, i.e., waking up in the morning to see it on her floor. Appellant told her at the time that he had gotten it from the junkyard. (See N.T. 02/02/15, pp. 86-96).

The Commonwealth next called Detective Kevin Gage to the stand. Detective Gage testified that, upon being assigned to J.H.'s ████████ case on March 20, 2013, he went around her neighborhood looking for surveillance videos. He was successful in locating surveillance footage from a pizza parlor across the street from J.H.'s ████████ residence. The video, which was taken on March 20, 2013, was shown to the jury at trial; it depicted two males hovering in front of and alongside J.H.'s ████████ residence shortly before 2:00 a.m., and the same two males reemerging at 2:44 a.m. carrying items in their hands. (See N.T. 02/02/15, pp. 113-134).

Additionally, Detective Gage testified that various items from the scene were submitted to the chemical lab for forensic analysis. Information received from the lab led to the development of Appellant as a suspect. On August 5, 2013, he assembled a photo array and presented it to ██ J.H. ████████, but she was unable to identify him. On the following day, Detective Gage and several other members from the SVU went to Appellant's address on Corlies Street; neither Appellant nor his girlfriend, Sharita Gaines, was home. He located Ms. Gaines, however, at a grocery store around the corner. He described the nature of his investigation, and asked if she would come to the SVU to speak further about it; she agreed. There, he showed Ms. Gaines the same surveillance video, from which she was able to positively identify both males as Appellant and

13

Co-Defendant Clark. Ms. Gaines also provided a statement documenting the above

identification, which was submitted into evidence. (See N.T. 02/02/15, pp. 135-142).

Detective Gage thereafter obtained arrest warrants for Appellant and Co-Defendant Clark,

the latter of whom was taken into custody on August 13, 2013. Co-Defendant Clark consented to

an interview, during which he admitted to participating in the robbery and burglary of J.B.K. and

J.H. ▓▓▓▓▓▓, respectively, but denying any role in their sexual assaults. (See N.T. 02/02/15, pp.

143-168).

On the following day, Detective Gage learned that Appellant had attempted to turn

himself in at a Federal ICE building. Appellant was transported to the SVU, where he agreed to

J.H.'S
be interviewed. In relevant part, Appellant admitted to breaking into ▓▓▓▓▓▓ residence,

sexually assaulting her, and taking her valuables:

> QUESTION: Okay. You and the other guy are inside and what happened next?
>
> ANSWER: When we went upstairs, we thought we heard voices, but it wasn't voices. It was one voice from inside the door in the back bedroom. We went into the back bedroom and the other guy grabbed her and I went in and assisted him. We grabbed her and this is when the other guy was grabbing her. The other guy was choking her. She wasn't kicking or punching. Then we were asking her where he was at or where the money was at. She was saying, No, he isn't here. We was in there for a minute; ten or fifteen minutes. I think I did the dumbest thing I could have done to keep her to shut up.
>
> QUESTION: What did you to to her?
>
> ANSWER: I actually didn't do anything to her. I pulled my pants down and then I did it. I did the dumbest thing I could have done. I put my dick in her.
>
> QUESTION: Where did you put your dick?

14

ANSWER: I didn't go into her butt. I put it into her vagina. I did this while I told her I would give her something to holler about. I just went off. I didn't let it go on for long. I snapped back out of it. The other guy was just sitting there on the chair looking at me. I just stepped back there and then I was just tripping. I got off of her. Then the other guy was sitting there with his pants down and the next thing I know -- I remember is the other guy coming over with some kind of rag or something with some kind of soap or something. He got on her. I was in the bedroom and I was snorting powder. I saw the other guy on her. Then I believe he was having sex with her, too. I saw him. He was rubbing her to clean her up afterward. He then told me he had soap on his hands and that he threatened her. Then he cleaned her up. The whole time I was just sitting there and my mind was blacking out. Then we got out of there.

QUESTION: What did you take from the house before you and the other guy left?

ANSWER: Two TVs and a air-conditioner. I think there was a couple of pieces of jewelry, too. I didn't get any money or anything. He may have [gotten] some.

(See N.T. 02/02/15, pp. 168-169; N.T. 02/03/15, pp. 10-29).

Detective Gage testified that Appellant also was questioned about the robbery and sexual assault of J.B.K. Appellant admitted to participating in the robbery -- i.e., accompanying the other guy who pressed a gun against her side, and further, going through her handbag for valuables -- but denied sexually assaulting her:

QUESTION: You didn't take anything from her that night but you were there when the other guy pointed his gun at the girl and then started going through her bag, correct?

ANSWER: Yes. But we didn't rape her.

QUESTION: When you were going through her pockets, do you think she felt that was a sexual assault?

ANSWER: Actually she didn't have no pockets. When she was walking up, the other guy was able to go right up to her and walk her right into the park. She had a skirt on with no

15

## ISSUES ON APPEAL

Appellant raises the following issues on appeal:

1. The evidence was insufficient to sustain a verdict of guilty where the victim was unable to identify the defendant as the person who committed the crime.

2. The verdict was against the weight of the credible evidence in that although a statement was read into the record from [Appellant] regarding his supposed involvement in the robbery and assault of [J.B.K.], there was no DNA analysis or other independent evidence.

3. There was inadequate identification evidence to sustain a verdict of guilty.

4. The sentence imposed was or may not have been within the sentencing guidelines as [Appellant] was sentenced to what amounts to a life sentence without proper explanation.

5. The sentence imposed is illegal/improper in that [Appellant] could be sentenced to a term of imprisonment of a greater degree than that of which he was convicted.

6. The trial court imposed an excessively punitive sentence where the sentence (4 to 8 years) and the aggregate sentence (36 to 72 years) amounts to a life sentence for [Appellant]. The Court failed to consider the guidelines in fashioning an appropriate sentence and failed to provide adequate reasons on the record.

7. The sentence imposed is violative of [Appellant's] constitutional right to be free of excessive punishment pursuant to the 8th Amendment to the United States Constitution and the Pennsylvania Constitution.

8. The Commonwealth engaged in a discovery violation regarding still photographs pulled from the videotapes in that the photographs were not previously provided, and the particular frames were not identified to counsel as pictures that were intended to be utilized during trial. The images were inflammatory and prejudicial.

17

(Appellant's Rule 1925(b) Statement, ¶¶ 1-8).

DISCUSSION

### 1. Appellant's Sufficiency Claim Is Waived.

Appellant claims that the evidence was insufficient to sustain one of the myriad, but unspecified, verdicts of guilty in this case because one of the numerous, but unspecified, victims was unable to identify him. This claim -- which is utterly vague and incapable of meaningful evaluation -- is waived pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).

Pennsylvania Rule of Appellate Procedure 1925(b)(4) (*Requirements; waiver*) specifically mandates that statements of matters complained of on appeal "shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa.R.A.P. 1925(b)(4)(ii).

> When the trial court has to guess what issues an appellant is appealing, that is not enough for meaningful review. When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues. In other words, a Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.

Commonwealth v. Lagenella, 17 A.3d 1257, 1265 (Pa. Super. 2011) (internal citations and quotations omitted); see also Lineberger v. Wyeth, 894 A.2d 141, 148 (Pa. Super. 2006) (same). Thus, Appellant's claim -- which is woefully vague and requires the Court to guess at the issues -- is incapable of meaningful review and should be deemed waived. See Lagenella, supra; Lineberger, supra; Commonwealth v. Dowling, 778 A.2d 683, 686 (Pa. Super. 2001); Pa.R.A.P. 1925(b)(4)(ii).

resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Patterson, 940 A.2d 493, 500 (Pa. Super. 2007).

A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that the evidence was sufficient to sustain the verdict. Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000) (citation omitted). In reviewing a weight claim, trial judges must not simply "reassess" the credibility of the witnesses, as they "do not sit as the thirteenth juror." Id. at 752 (citation omitted). "Rather, the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" Id.

Instantly, having presided over Appellant's jury trial, this Court is confident that the jury's verdict with regard to J.B.K. was soundly supported by the weight of the evidence. Indeed, J.B.K.'s testimony was detailed, consistent and uncontradicted, and the jury certainly was entitled to credit her testimony. Simply put, the jury's verdict was hardly contrary to the evidence to the effect of shocking one's sense of justice.

### 3. Appellant's Second Sufficiency Claim Is Waived.

Next, Appellant claims that "[t]here was inadequate identification evidence to sustain a verdict of guilty." This claim -- prohibitively nonspecific -- is waived for the reasons set forth in Discussion Section 1, supra. In any event, the Court observes that any theoretical inadequacy of identification evidence is overcome by the mountain of other evidence establishing Appellant's guilt for the offenses in this case beyond a reasonable doubt.

20

**4-7. The Court Did Not Abuse Its Discretion in Imposing Sentence.**

Appellant's next four claims comprise challenges to the discretionary aspects of sentencing. These claims are without merit.

Preliminarily, while Appellant uses the term "illegal" and alleges a violation of the 8th Amendment, he does not present a claim of "illegal sentence". "'[A]n illegal sentence is one that exceeds the statutory limits.'" Commonwealth v. Berry, 877 A.2d 479, 482 (Pa. Super. 2005) (en banc) (quoting Commonwealth v. Bradley, 575 Pa. 141, 834 A.2d 1127, 1131 (Pa. 2003). Alternatively, "'if no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction.'" Berry at 483 (quoting Commonwealth v. Lipinski, 841 A.2d 537, 539. (Pa. Super. 2004). Neither of the above applies here.

"A punishment authorized by [statute] violates the proscription against cruel and unusual punishment only if it is so disproportionate to an offense as to offend evolving standards of decency or a balanced sense of justice." Commonwealth v. Green, 593 A.2d 899, 901 (Pa. Super. 1991) (citations and quotations omitted). "[I]n assessing a claim that a sentence is so disproportionate as to violate the eighth amendment, '[r]eviewing courts...should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishment for crimes....'" Id. (citations and quotations omitted).

It is well settled that sentencing is a matter vested in the discretion of the sentencing court and will not be disturbed on appeal absent a manifest abuse of discretion. Commonwealth v. Gribble, 703 A.2d 426, 437 (Pa. 1997). "In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision."

21

<u>Commonwealth v. Rodda</u>, 723 A.2d 212, 214 (Pa. Super. 1999) (<u>en banc</u>) (citations and internal quotations omitted). A reviewing court must accord great weight to the sentencing court's discretion because it is in the best position to view a defendant's character, exhibition of remorse, indifference, and the general nature of the crime. <u>See Commonwealth v. Sierra</u>, 752 A.2d 910, 915 (Pa. Super. 2000); <u>Commonwealth v. Brown</u>, 741 A.2d 726, 735 (Pa. Super. 1999) (<u>en banc</u>).

Here, Appellant essentially claims that this Court abused its discretion by imposing consecutive sentences[7] -- for his multiple robberies, rape, aggravated assault and conspiracy convictions -- and by allegedly failing to provide reasons justifying same. The record, however, clearly reflects that this Court considered all relevant facts and circumstances and thoroughly explained its rationale prior to imposing sentence. Specifically, in addition to Appellant's presentence investigation report and the sentencing guidelines, this Court expressly considered the violent nature and circumstances of Appellant's offenses, his SVP status, the protection of the public, the gravity of the offenses, the character and condition of Appellant, his family background and support, his children, his scant work history, his passive expression of remorse, and his substantial prior record -- which, just as an <u>adult</u>, comprised seventeen (17) arrests, eleven (11) convictions, thirteen (13) commitments, eight (8) violations and seven (7) revocations. (<u>See</u> N.T. 11/06/15, pp. 58-60, 82-133).

---

[7] It bears noting that Appellant did not remotely receive the maximum sentence allowed, and in fact, received the benefit of having no further penalty imposed on 11 of his convictions -- 9 of which were felonies of the first degree. (<u>See</u> N.T. 11/06/15, pp. 128-132).

22

Among other things, this Court expressed the following on the record:

THE COURT: All right. Thank you, Mr. Riggins. I have, of course, reviewed the presentence report, the mental health and the defendant's record. Certainly as has already been stated, Mr. Riggins had an extremely difficult childhood saying that he had been molested by an uncle in his teens. The records reflect he was put in protective custody and commit[ted] to DHS. Also was committed by the Court to DHS.

However, Mr. Riggins reports being raised by his parents and that his parents remained together throughout his childhood. He reports graduating from high school but the transcripts shows that he withdrew in the ninth grade.

There were apparently a number of homes in Philadelphia also in Atlanta, Georgia where Mr. Riggins resided. Mr. Riggins was married or is married and has seven children with six different women and notably one with a minor who was 14 years old.

Mr. Riggins has been shot, according to him, three times I believe, stabbed two times and has a very significant mental health history including according to the reports a 302 [involuntary] commitment in 2001, has hallucinations, hearing voices, coupled with substance abuse, marijuana, Xanax, cocaine on the mental health summary. The diagnosis is post-traumatic stress, bipolar and substance abuse.

Mr. Riggins states he enjoys reading and writing poetry. There's been a small employment history with Wal-Mart in 2011.

In regard to the criminal record, Mr. Riggins had no juvenile -- well, he had a record two arrests but no adjudications; however, starting at age 18 as an adult, 17 arrests; 11 convictions; 13 commitments; eight violations; seven revocations. Well, at age 23 a gun conviction and then five violations on that one sentence.

Age 26 corruption of a minor and that I believe was in regard to the 14-year-old girl who then got pregnant and gave birth to one of Mr. Riggins' children, correct? And that leads us to the current offenses.

Mr. Riggins, the jury found that your participation in the offenses committed against ███████ constituted rape, the

J.H.

23

evidence was more than sufficient to support their verdict as I said earlier. The attack on ████████ J.H. was horrific. It was inhuman.

Well, she was 65 at the time she testified, so she was 62 at the time of the offense, and I do recall that there was some problem that you had with her son and, therefore, you knew ████████. You targeted ████████ knowing that she lived alone and you brought Mr. Clark with you as your enforcer.

The two of you broke into her house, [ ] you got into her house by saying you were the fire department. You hit her in the head with a flashlight, put a pillow over her face, locked her doors. She begged you not to kill her. She tried to get away from you. Both you and Mr. Clark were in her bedroom. She was tied with her bath[robe] belt. Her hands were tied. She was tied with her pajama pants around her mouth so she could not scream. Mr. Clark left and, Mr. Riggins, you proceeded to rape a 62-year-old woman in her own bedroom in her own bed.

████████ J.H. suffered certainly physical injuries as well as unimaginable psychological and mental injury.

And as if that weren't enough, then in July just four months later you [and] Mr. Clark began your crime spree of holding up at gunpoint four gentlemen who were in various locations at 4:00 in the morning, 3:00 in the morning, 26th and Lehigh; a 53-year-old man; Mr. Chandler, a gunpoint robbery, 26th and Lehigh; a 55-year-old truck driver, Gregory Johnson, gunpoint robbery, 4:20 a.m., 29th and York; 41-year-old Earle Wilson gunpoint robbery; August 2nd, 3:30 in the morning, 16th and Susquehanna; 21-year-old Alex Smith, gunpoint robbery, you being the gunman, you being identified as holding the gun.

Well, I guess chronologically this was in July, the 15-year-old J.B.K., homeless girl clearly a problem, clearly not somebody who would ever be able to defend themselves. While Mr. Clark in that case held the gun, you took her into the alley, you put your hands into her underwear and fondled her, a 15-year-old girl and then robbed her.

I will say Mr. Riggins, I have been on the bench for ten years and I've presided over some pretty bad cases. I don't know that I've encountered a more cruel series of criminal activity as this has been. And to force these women particularly the women to come into court and testify in front of a group of strangers about

24

what happened to them was a heartbreaking experience I'm sure for the jury as well as for the Court.

Certainly, as I said earlier, my job is to fashion a sentence that addresses a number of issues, that is your personal upbringing and ability to right yourself from what was a very difficult childhood. The potential for rehabilitation again having been through 11 convictions, 13 commitments and eight violations of probation and parole, you have shown yourself, Mr. Riggins, not to be amenable to rehabilitation efforts that have gone on from Judges before me, from probation officers through the courts for many, many, many years to where at age 37 you are still committing violent crime.

As Dr. Ziv said it is unusual, and I said this to [Co-Defendant] Clark, for a man of your age to still be committing the type of violent offenses that you committed, it's not the usual. Generally by your point in time in your life men have slowed down. You have a family of seven children who you claim you are concerned about and need to support. Your work history, I think included only the Wal-Mart, so I don't think that supporting them has been uppermost in your mind. You can remain seated while I impose your sentence.

(See N.T. 11/06/15, pp. 121-128). Thus, the record demonstrates that, contrary to Appellant's contentions, this Court carefully and explicitly considered all relevant factors and circumstances in crafting a sentence tailored to this case. As such, Appellant is due no relief.

## 8. The Use of Still Images Did Not Comprise a Discovery Violation

Finally, Appellant contends that the Commonwealth engaged in a discovery violation by using still photographs pulled from videotapes, which he contends, were inflammatory and prejudicial. This claim is without merit.

"[Q]uestions involving discovery in criminal cases lie within the discretion of the trial court and that court's decision will not be reversed unless such discretion was abused." Commonwealth v. A.G., 955 A.2d 1022, 1025 (Pa. Super. 2008) (citation omitted). "Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or

25

the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record." Commonwealth v. Montalvo, 986 A.2d 84, 94 (Pa. 2009) (citation omitted).

Pennsylvania Rule of Criminal Procedure 573 (Pretrial Discovery and Inspection), in relevant part provides:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 573(E).

Here, prior to the second day of testimony, Appellant objected to the proposed introduction of still images from surveillance videos on the bases that they comprised a discovery violation and were prejudicial to the defense. Upon hearing argument from both sides outside the presence of the jury, the Court determined that the photos were taken from videos that already had been turned over during discovery, and as such, there was no discovery violation. (See N.T. 01/30/15, pp. 6-7). Indeed, Appellant could have pulled the same images at any point prior to trial had he wished to do so. Nor did Appellant suffer prejudice merely because the photographs appeared to depict him. The photographs comprised demonstrative evidence and were properly utilized as such. Appellant's claim is without merit.

## CONCLUSION

Based on the reasons set forth in the foregoing Opinion, this Court's judgment of sentence should be affirmed.

BY THE COURT:

DATE: 10/5/16

SUSAN I. SCHULMAN, J.

Circulated 11/06/2017 10:05 AM

FILED

OCT 1 1 2017

Office of Judicial Records
Appeals/Post Trial

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0011009-2013
: CP-51-CR-0012347-2013
CP-51-CR-0012349-2013 Comm v Riggins Rahem A : CP-51-CR-0012349-2013
Opinion
VS.    CP-51-CR-0012351-2013
CP-51-CR-0012352-2013
CP-51-CR-0013662-2013

RAHEIM RIGGINS    8016312591    37 EDA 2016

SUPPLEMENTAL OPINION

SCHULMAN, S.I., J.

This matter is before the Court following remand by the Superior Court for analysis of

five additional issues deemed preserved (in six Rule 1925(b) statements apparently filed by

counsel for Appellant). See Commonwealth v. Riggins, No. 37 EDA 2016 (September 26, 2017)

(Judgment Order). Based on the reasons set forth in this Court's previous Rule 1925(a) Opinion

(filed October 5, 2016), and for the reasons set forth herein, the Court recommends that its

judgment be affirmed.

PROCEDURAL HISTORY

On February 4, 2015, following a jury trial before this Court, Appellant was convicted of:

five (5) counts of Robbery; one (1) count each of Rape, Aggravated Assault, Burglary, Unlawful

Restraint, Indecent Assault, Firearms Not to Be Carried without a License, and Carrying

Firearms on Public Streets in Philadelphia; and ten (10) counts of Criminal Conspiracy (to

commit Robbery (5), Rape, Aggravated Assault, Burglary, Unlawful Restraint, and Indecent

Assault).

On November 6, 2015, upon review of the pre-sentence investigation report and

consideration of all relevant facts and circumstances of this case, the Court sentenced Appellant

to an aggregate term of 36 to 72 years' incarceration. Following the denial of post-sentence motions, Appellant timely filed a Notice of Appeal. On May 19, 2016, the Court ordered him to file a Concise Statement of Matters Complained of on Appeal in accord with Pa.R.A.P. 1925(b).[1]

Counsel for Appellant apparently filed six different Rule 1925(b) statements -- but served the Court with only one. In the lone Rule 1925(b) statement provided to the Court, Appellant raised eight issues, each of which the Court addressed in its Rule 1925(a) Opinion filed on October 5, 2016.

On September 26, 2017, the Superior Court issued a Judgment Order remanding the case to this Court for analysis of five additional issues that the Superior Court deemed preserved in Appellant's six separate Rule 1925(b) statements. See Commonwealth v. Riggins, No. 37 EDA 2016 (September 26, 2017) (Judgment Order).

FACTUAL HISTORY

At trial, the Commonwealth first called Philadelphia Police Officer Andrew Revucky to the stand. Officer Revucky testified that, on March 20, 2013 at approximately 3:00 a.m., he received a radio call which took him to 2307 Clearfield Street in Philadelphia. There, he encountered complainant J.H. ▮▮▮▮▮▮▮▮, who was "very distraught, crying, very upset", and stated that she had just been raped, beaten and burglarized by two black males. Specifically, she said she heard and saw two black males come into her home wearing all black clothing, shining flashlights; they held her down by her neck, bound her wrists and raped her. They also removed numerous items of value and cash from her home. She eventually was able to free herself after they left, and went to her neighbor's house to call police. (See N.T. 01/29/15, pp. 30-35).

---

[1] The Court issued one Order listing all six consolidated cases in the caption.

2

Next, the Commonwealth presented the testimony of complainant J.H. [REDACTED]. J.H. [REDACTED] testified that, in the early morning hours March 20, 2013, she was asleep in her bed inside her home at 2303 Clearfield Street in Philadelphia, when she heard two men inside her home. J.H. [REDACTED] was 62 years old at the time. The men came upstairs with flashlights and yelled, "This is the Fire Department". She jumped out of bed and screamed, at which point one of them hit her in the head with a flashlight. One of the males then grabbed her forcefully by the throat while the other tried to put a pillow over her face. J.H. [REDACTED] desperately wriggled free and said, "Please don't kill me. Please don't kill me." One of the males ordered her to put her hands behind her back; they then tied her hands together with the belt from her bathrobe, tied thermal pants around her mouth, and held her face down. (See N.T. 01/29/15, pp. 37-46, 77-78).

While one of the males was ransacking through her belongings, the other pulled down her pajama bottoms, and tried to insert his penis into her anus. It did not go all the way in, so he flipped her over onto her back, lifted up her legs, and again inserted his penis into her anus. After a while, he flipped her over again onto her stomach, rubbed "something hot" on/around her genitals, and then left the room. (See N.T. 01/29/15, pp. 44-52, 60).

Paralyzed from fear, and physically bound, J.H. [REDACTED] lay in her bed for 20 minutes, until it was "really quiet". She then wriggled her hands free, and removed the binding from her mouth. She went downstairs and saw that both her back and front doors were wide open. She grabbed her keys, ran to her neighbor's house at 2307 Clearfield Street, and called police. After describing the above events to responding police officers, J.H. [REDACTED] was transported to Episcopal Hospital for a rape kit and medical treatment. She was observed to have a tear to her anus, a swollen cheek, and a bruised forehead. (See N.T. 01/29/15, pp. 47, 51-53, 56-57, 61-62).

3

**J. H.** also testified that the intruders had taken her jewelry, two (2) flat screen televisions, her cell phone, a digital camera, her wallet with $80 cash, and all her identification and credit cards. She also noted that she had locked her doors before going to bed that night. (See N.T. 01/29/15, pp. 41, 53-56).

Philadelphia Police Detective Thomas Martinka testified next for the Commonwealth. Detective Martinka testified that, on March 20, 2013 at approximately 3:00 a.m., he was assigned to investigate the robbery and sexual assault of **J. H.**. Upon receiving the assignment, he and his partner, Detective Taylor, went to Episcopal Hospital to interview **J. H.**. After recording a detailed description of the events, the detectives then went to **J. H.'s** home, which was being "held" by uniformed police officers as a crime scene. There, Detectives Martinka and Taylor took photographs of the scene and collected various pieces of evidence, including **J. H.'s** purse, pillow case, robe, robe tie, and bed quilt -- all of which were secured under property receipt for chemical (DNA) analysis. Additionally, Detective Martinka testified that his Crime Scene Unit attempted to lift fingerprints from various locations inside the home. (See N.T. 01/29/15, pp. 80-89).

The Commonwealth next called complainant Christopher Darrell Chandler to the stand. Mr. Chandler testified that on July 26, 2013, at approximately 3:00 a.m., he was on his way home from work, walking westbound on the 2600 block of Lehigh Avenue, when he was approached by two black males. One of the males was approximately six feet (6') tall with a lighter complexion and medium build, and the other was shorter, approximately five feet, seven inches (5'7") tall with a darker complexion and stocky build. When the males were a few feet from him, Mr. Chandler saw that the shorter male was holding and pointing a gun below his waist. He ordered Mr. Chandler to "stand right there." Mr. Chandler complied, and the taller male then

4

walked behind him and started rifling through his pockets. The males then ordered him to walk around the corner with them, where it was darker. There, they went through his wallet, retrieved his debit card and asked for his PIN; Mr. Chandler complied. The taller male took the card to an ATM, while the shorter male continued to hold Mr. Chandler at gunpoint. When the taller male returned, they told Mr. Chandler to "take a walk and don't look back". He walked straight home and called police. (See N.T. 01/29/15, pp. 92-101).

When police arrived, Mr. Chandler declined to go looking through the area for his attackers because he was "too shaken up". Instead, he went to Central Detectives for an interview, during which he provided a detailed physical descriptions of his assailants. Mr. Chandler subsequently was shown a photo array at his home, from which array he positively identified Appellant as his assailant. He also positively identified Appellant in court. (See N.T. 01/29/15, pp. 102-111).

Forensic Nurse Examiner Jenny Smith took the stand next for the Commonwealth. Nurse Smith testified that, on March 20, 2013 at approximately 6:50 a.m., she examined ▨▨▨ J.H. ▨▨▨ at the Sexual Assault Response Center. Nurse Smith testified that during the examination, ▨▨ J.H. ▨▨ reported a sexual assault that also involved a weapon, hitting, grabbing, pushing, gagging, strangulation, being tied up, and verbal threats. More specifically, she had been hit with a flashlight, gagged with her own thermal pants, had her hands tied behind her back, and reported both vaginal and anal penetration by penis. (See N.T. 01/29/15, pp. 122-134).

Nurse Smith observed the injuries to ▨▨ J.H. ▨▨:

> On the external of her vagina, I did note that she had a tear in an
> area called the posterior fourchette as well as tenderness. I noted
> that she had tenderness to the perineum, anus, as well as a tear on

5

her anus. ... [On the inside of her vagina,] I noted that she had bruising to the left and the right vaginal walls [and] that she also had internal tenderness to both vaginal walls and the cervix as well.

(See N.T. 01/29/15, p. 137). Additionally, Nurse Smith observed various injuries to ███. J.H.'s ██████ person, including: abrasions and lacerations to her mouth (upper and lower lips); abrasions, tenderness and a laceration to her neck; an abrasion to her left hand; and a contusion to her right knee. Nurse Smith also took numerous photographs of ██████ J.H.'s injuries. (See N.T. 01/29/15, pp. 134-136, 139).

Nurse Smith further noted that ██████ J.H. consented to multiple antibiotics to prevent STDs, Plan B contraceptive, and HIV prevention medication. Finally, in addition to drawing ███ J.H.'s ██████ blood for a DNA reference sample, Nurse Smith collected swabs of her internal and external vagina, rectal area and perineum. (See N.T. 01/29/15, pp. 138-140).

The Commonwealth next presented the testimony of complainant Gregory K. Johnson. Mr. Johnson testified that, on July 26, 2013 at approximately 4:45 a.m., he was on his way to work, walking westbound on the 2600 block of Lehigh Avenue, when he was approached by two black males. One of the males was approximately five feet, seven inches (5'7") tall and dark skinned, and the other was approximately six feet, one inch (6'1") tall with a lighter complexion; both males were holding black handguns. The shorter male grabbed Mr. Johnson by the jacket and said, "Get over there." The taller male pressed his handgun against Mr. Johnson's head and said, "You heard what he said. Get over there." They pulled him over to a parked white van, where the shorter male went through his pockets, while the taller male held his gun against Mr. Johnson's head, and repeatedly stated, "I should shoot you." (See N.T. 01/29/15, pp. 143-149, 156-158).

The bandits made off with Mr. Johnson's necklace, $800 cash from his wallet,[2] two cell phones (one of which was for his job), $132 cash from his pants pocket, cigarettes and eyeglasses. The altercation ended when the shorter male discarded Mr. Johnson's wallet to the ground, and told him to "stay facing one direction", at which time the males ran in the opposite direction. Without a phone, Mr. Johnson then proceeded to retrieve his work truck and returned to Lehigh Avenue, where he found a police car sitting at the intersection of 26th and Lehigh. Upon giving a description to police, he reported to work (because if he did not show up for work, he would not get paid). (See N.T. 01/29/15, pp. 149-154).

On August 5, 2013, detectives interviewed Mr. Johnson at his home, during which he described the robbery and provided a detailed physical description of his attackers. On the same date, Mr. Johnson positively identified both Appellant and Co-Defendant Hashiem Clark, from respective photo arrays, as his assailants. Mr. Johnson also positively identified Appellant and Co-Defendant Clark in court. (See N.T. 01/29/15, pp. 154-161).

Complainant Earle Wilson also testified at trial. Mr. Wilson testified that, on July 21, 2013 at approximately 4:20 a.m., he was walking to work on North 29th Street at its intersection with York Street, when he noticed two black males crossing the street and walking toward him. One of the males was shorter with a dark complexion, and the other male was taller with a lighter complexion. As they neared Mr. Wilson, the shorter male stated, "What are you looking at?" Mr. Wilson responded, "Nothing. I'm messing with my keys." The shorter male replied, "I don't like the way you said that", and then the males set in on him. The shorter male retrieved a black handgun from his waistband and pressed it against Mr. Wilson's chest, while the taller male went

---

[2] Mr. Johnson was carrying the cash because he was going to buy a present for his daughter's upcoming birthday. (See N.T. 01/29/15, p. 150).

7

through his pockets. The males were standing side-by-side and facing Mr. Wilson. They took his wallet, which contained $26, his SEPTA TransPass, bank card, Social Security card, and birth certificate, among other things. The males then told Mr. Wilson to walk away; he complied. He walked back to his home, and feeling very upset, told his wife he had just been robbed. Mr. Wilson reported the robbery later that day after work. He was interviewed by detectives at his home on August 14, 2013, at which he gave a detailed account of the above events. He was shown photo arrays but not able to make a positive identification. However, he positively identified Appellant and Co-Defendant Clark both at the preliminary hearing and at trial, as his assailants. (See N.T. 01/30/15, pp. 9-49).

Next, the Commonwealth called complainant Alexander Smith to the witness stand. Mr. Smith testified that, on August 2, 2013 at approximately 3:30 a.m., he was walking on North 16th Street approaching Susquehanna Avenue, when two black males walked past him. He continued walking for another half block, at which time the same two males ran up from behind, grabbed him and pushed him against a parked trailer. Mr. Smith testified that he was then struck in the back of the head with an object, and then punched in the face. One of the males, whom he identified as Appellant, pressed a gun against his right side, while the other "tall, black" male went through his pockets. Appellant and his cohort took Mr. Smith's wallet, which contained his identification, debit and credit cards, and also took his iPod and car keys. They then told him to run, and Mr. Smith complied. He saw some kids sitting on a front porch on Diamond Street and borrowed their phone to call police. After providing a description to the responding police officer, he was transported to Central Detectives for an interview. Approximately one week later, Mr. Smith was shown photo arrays, from which he positively identified Appellant. He also positively identified Appellant in court. (See N.T. 01/30/15, pp. 50-68).

8

The Commonwealth next presented the testimony of complainant J.B.K., a minor. J.B.K. testified that, on July 24, 2013 at approximately 11:00 p.m., she was walking on the 2600 block of North 22nd Street, when she was approached by two black males -- one of whom was short and dark-skinned, and the other was tall. The taller male pulled out a black handgun, which resembled "a police gun", and the shorter male instructed, "Grab her, get her up, take her across the street"; the taller man obliged, grabbing J.B.K. by the back of the neck and pushing her across the street. The taller male grabbed her purse and emptied its contents on the sidewalk. The shorter male then pulled J.B.K. -- then just 15 years old -- into an adjacent alley, removed her pants, reached beneath her underwear, and fondled her vagina. When the taller man appeared and announced that he was "done", the males escorted J.B.K. out of the alley and told her to go back where she came from and that "if [she] called the police, it was not going to be nice." (See N.T. 01/30/15, pp. 81-95).

J.B.K. walked away and, after waiting until she was at a safe distance, borrowed a pedestrian's cell phone to call police. Police arrived immediately; upon describing what had just happened, she was transported to the Special Victim's Unit ("SVU"), where she was interviewed by a female detective. Among other things, she described the physical characteristics and clothing of the shorter male as: "African American, early 20s, dark skinned, short[,] bald, and had a beard. He was wearing gray shorts and black sneakers." She described the second male as: "African American, early 20s, tall". (See N.T. 01/30/15, pp. 96-99).[3]

---

[3] The Commonwealth next called Philadelphia Police Officer Andrew McCrea, Detective Keenya Taylor, and Detective Linda Pace, respectively. Officer McCrea testified that he responded to the above incident concerning J.B.K., prepared the initial (75-48) report, and ultimately transported J.B.K. to the SVU. Detective Taylor testified that she interviewed J.B.K. at the SVU on the night of the attack. Detective Pace testified that, on August 8, 2013, she conducted a follow-up interview of J.B.K. at her residence for the purpose of presenting a photo array, but J.B.K. was unable to make an identification. (See N.T. 01/30/15, pp. 114-134).

9

Philadelphia Police Detective James Waring testified next for the Commonwealth. Detective Waring testified that, along with his partner, Detective Ralph Domenic, he is a member of Central Detectives' Special Investigative Unit, and works exclusively on robberies. As part of his work, Detective Waring reviews all robbery complaints that come in, in order to look for "patterns" -- e.g., similar incidents, in the same areas, similar descriptions of the offenders, weapons used, et cetera. (See N.T. 01/30/15, pp. 136-139).

Detective Waring observed one such pattern in a specific set of robberies in July and August 2013:

> In each of the robberies there were two black males. The descriptions for most of them were taller black male and a shorter black male. They were occurring, for the most part, along Lehigh Avenue and maybe a couple blocks south of there with handguns. A lot of them -- well, most of them were after midnight and then up until 3:00 or 4:00 in the morning. So that's what -- I mean, we recognized the pattern pretty easily.

(N.T. 01/30/15, p. 139).

Detective Waring testified that the above pattern applied to the robberies of Christopher Chandler, Gregory Johnson, Earle Wilson, Alex Smith, and J.B.K. Accordingly, he canvassed the area looking for surveillance videos, and was able to find a couple from neighborhood stores. The videos, which were shown to the jury, depicted two males walking to/from the robberies of Mr. Chandler and Mr. Johnson (Mr. Johnson also appeared in one the videos as he was being robbed). The same two males were wearing the same clothes in both videos; they matched the descriptions as reported by Mr. Chandler and Mr. Johnson; and were traveling in the direction consistent with said reports. Still images of the males also were shown to the jury. Detective Waring testified that he attempted, but could not find, surveillance videos pertinent to the robberies of Earle Wilson, Alex Smith and J.B.K. (See N.T. 01/30/15, pp. 143-158).

10

Detective Waring testified that, consistent with police protocol, he posted the videos on YouTube. Information subsequently received from viewers, led him to follow up with Mr. Johnson at his residence on August 5, 2013. Detective Waring presented him with a photo array, from which Mr. Johnson positively identified Appellant as one of his assailants. Later that day, Detective Waring obtained and executed a warrant to search Appellant's home. Appellant was not home; however, Detective Waring encountered a woman by the name of Sharita Gaines, who was in possession of proceeds from one of the robberies, to wit, Mr. Smith's iPod (as confirmed by Mr. Smith per its contents). The iPod was recorded on a property receipt and returned to Mr. Smith. (See N.T. 01/30/15, pp. 159-165).

Detective Waring transported Ms. Gaines to Central Detectives for an interview. As a result of the interview, he developed a second suspect -- Co-Defendant Clark. Accordingly, he met with Mr. Johnson and presented him with a second photo array that included Co-Defendant Clark. Mr. Johnson positively identified Co-Defendant Clark as the other male who had robbed him. Detective Waring thereafter presented photo arrays to Mr. Chandler, who positively identified Appellant as his assailant; Mr. Chandler was unable to identify Co-Defendant Clark from the second array. (See N.T. 01/30/15, pp. 165-170).

Detective Waring obtained arrest warrants for Appellant and Co-Defendant Clark, the latter of whom was taken into custody first. Co-Defendant Clark consented to a formal interview on August 13, 2013. In his interview, Co-Defendant Clark provided detailed accounts of the robberies of Messrs. Johnson, Chandler, Smith and Wilson; he admitted to committing these robberies with the "same guy" each time. (See N.T. 01/30/15, pp. 189-198).

Early the next day, August 14, 2013, Appellant attempted to turn himself in at a Federal Immigration Custody Enforcement (ICE) building. Police were notified and he was taken into

11

custody; on the same date, Appellant agreed to be interviewed. Appellant provided detailed accounts of the robberies of Messrs. Johnson, Chandler, Smith and Wilson, which he admitted to committing with the same "other guy". (See N.T. 01/30/15, pp. 199-218).

Detective Waring also testified that as part of the intake process, the height and weight of arrestees are recorded. In that regard, at the time of their respective arrests, Appellant was five feet, seven inches (5'7") tall and weighed 155 pounds, and Co-Defendant Clark was six feet (6') tall and weighed 195 pounds. (See N.T. 02/02/15, pp. 7-8).[4]

The Commonwealth also called its expert DNA analyst, Gregory Van Alstin, to the stand. Mr. Van Alstin, who works in the DNA lab at the Philadelphia Office of Forensic Science, testified that he conducted DNA comparison analyses of samples from the items collected at ▓. J.H.'S ▓▓▓ residence. Specifically, Mr. Van Alstin extracted DNA profiles from the collected items and compared them with the known DNA profiles of ▓▓▓ J.H., Co-Defendant Clark, and Appellant. Based on his analysis, Mr. Van Alstin was able to determine that ▓▓▓ J.H.'s robe tie had one major DNA contributor -- ▓▓▓ J.H. -- along with two minor contributors. While the DNA from the minor contributors was insufficient to render a conclusive determination, Mr. Van Alstin was able to conclude that at least one of the minor contributors was a male. Further, Mr. Van Alstin was able to determine that both Appellant and ▓▓▓ J.H. were contributors to the DNA from the shoulder strap/zipper of ▓▓▓ J.H.'s handbag. Mr. Van

---

[4] The Commonwealth next presented the expert testimony of Deanna Zarzecki, a forensic scientist with the Philadelphia Office of Forensic Science. Ms. Zarzecki testified that she was asked to analyze various items collected under property receipt from ▓▓▓ residence, for the presence of: (1) acid phosphatase (an enzyme present in seminal fluid); (2) P-30 (a protein found in seminal fluid); and (3) sperm. Ms. Zarzecki was unable to detect the presence of any of the above substances. (See N.T. 02/02/15, pp. 35-59).

Alstin issued these findings to a reasonable degree of scientific certainty (See N.T. 02/02/15, pp. 62-73, 77-79).[5]

Next, the Commonwealth called Sharita Gaines to the stand. Ms. Gaines testified that she had been Appellant's girlfriend since 2011, and still was his girlfriend at the time of trial. Ms. Gaines testified that during the period of March to August 2013, she recalled seeing Appellant and Co-Defendant Clark together periodically. In August 2013, Philadelphia Police Detectives searched her house, at which time they recovered an iPod from her purse. Ms. Gaines testified that she had obtained the iPod from Appellant. On the same date of the search, she was taken to Central Detectives for an interview, at which time she was shown two surveillance videos from the robberies; Ms. Gaines identified Appellant and Co-Defendant Clark in the surveillance videos. Ms. Gaines also positively identified Appellant and Co-Defendant Clark from another surveillance video shown at trial. Finally, Ms. Gaines admitted to observing a flat screen television in her home that she had not seen before, i.e., waking up in the morning to see it on her floor. Appellant told her at the time that he had gotten it from the junkyard. (See N.T. 02/02/15, pp. 86-96).

The Commonwealth next called Detective Kevin Gage to the stand. Detective Gage testified that, upon being assigned to J.H.'s ▓▓▓▓▓ case on March 20, 2013, he went around her neighborhood looking for surveillance videos. He was successful in locating surveillance footage from a pizza parlor across the street from J.H.'s ▓▓▓▓▓ residence. The video, which was taken on March 20, 2013, was shown to the jury at trial; it depicted two males hovering in front

---

[5] Mr. Van Alstin observed that the remaining samples that he tested either contained data that was insufficient for comparison or no inclusions for Appellant or Co-Defendant Clark. (See N.T. 02/02/15, p. 79).

13

of and alongside J.H.'s ████████ residence shortly before 2:00 a.m., and the same two males reemerging at 2:44 a.m. carrying items in their hands. (See N.T. 02/02/15, pp. 113-134).

Additionally, Detective Gage testified that various items from the scene were submitted to the chemical lab for forensic analysis. Information received from the lab led to the development of Appellant as a suspect. On August 5, 2013, he assembled a photo array and presented it to ██ J.H. ██████, but she was unable to identify him. On the following day, Detective Gage and several other members from the SVU went to Appellant's address on Corlies Street; neither Appellant nor his girlfriend, Sharita Gaines, was home. He located Ms. Gaines, however, at a grocery store around the corner. He described the nature of his investigation, and asked if she would come to the SVU to speak further about it; she agreed. There, he showed Ms. Gaines the same surveillance video, from which she was able to positively identify both males as Appellant and Co-Defendant Clark. Ms. Gaines also provided a statement documenting the above identification, which was submitted into evidence. (See N.T. 02/02/15, pp. 135-142).

Detective Gage thereafter obtained arrest warrants for Appellant and Co-Defendant Clark, the latter of whom was taken into custody on August 13, 2013. Co-Defendant Clark consented to an interview, during which he admitted to participating in the robbery and burglary of J.B.K. and J.H. ██████████, respectively, but denying any role in their sexual assaults. (See N.T. 02/02/15, pp. 143-168).

On the following day, Detective Gage learned that Appellant had attempted to turn himself in at a Federal ICE building. Appellant was transported to the SVU, where he agreed to be interviewed. In relevant part, Appellant admitted to breaking into J.H.'s ████████ residence, sexually assaulting her, and taking her valuables:

14

QUESTION: Okay. You and the other guy are inside and what happened next?

ANSWER: When we went upstairs, we thought we heard voices, but it wasn't voices. It was one voice from inside the door in the back bedroom. We went into the back bedroom and the other guy grabbed her and I went in and assisted him. We grabbed her and this is when the other guy was grabbing her. The other guy was choking her. She wasn't kicking or punching. Then we were asking her where he was at or where the money was at. She was saying, No, he isn't here. We was in there for a minute; ten or fifteen minutes. I think I did the dumbest thing I could have done to keep her to shut up.

QUESTION: What did you do to her?

ANSWER: I actually didn't do anything to her. I pulled my pants down and then I did it. I did the dumbest thing I could have done. I put my dick in her.

QUESTION: Where did you put your dick?

ANSWER: I didn't go into her butt. I put it into her vagina. I did this while I told her I would give her something to holler about. I just went off. I didn't let it go on for long. I snapped back out of it. The other guy was just sitting there on the chair looking at me. I just stepped back there and then I was just tripping. I got off of her. Then the other guy was sitting there with his pants down and the next thing I know -- I remember is the other guy coming over with some kind of rag or something with some kind of soap or something. He got on her. I was in the bedroom and I was snorting powder. I saw the other guy on her. Then I believe he was having sex with her, too. I saw him. He was rubbing her to clean her up afterward. He then told me he had soap on his hands and that he threatened her. Then he cleaned her up. The whole time I was just sitting there and my mind was blacking out. Then we got out of there.

QUESTION: What did you take from the house before you and the other guy left?

ANSWER: Two TVs and a air-conditioner. I think there was a couple of pieces of jewelry, too. I didn't get any money or anything. He may have [gotten] some.

15

(See N.T. 02/02/15, pp. 168-169; N.T. 02/03/15, pp. 10-29).

Detective Gage testified that Appellant also was questioned about the robbery and sexual assault of J.B.K. Appellant admitted to participating in the robbery -- i.e., accompanying the other guy who pressed a gun against her side, and further, going through her handbag for valuables -- but denied sexually assaulting her:

> QUESTION: You didn't take anything from her that night but you were there when the other guy pointed his gun at the girl and then started going through her bag, correct?
>
> ANSWER: Yes. But we didn't rape her.
>
> QUESTION: When you were going through her pockets, do you think she felt that was a sexual assault?
>
> ANSWER: Actually she didn't have no pockets. When she was walking up, the other guy was able to go right up to her and walk her right into the park. She had a skirt on with no pockets. She had a shirt on with her stuff hanging all out. Nobody touched her. After that, I told her to walk straight down. Nobody touched her vagina. Once the bag was empty, there was nothing else to do. I didn't grab her pussy. I looked when she was pulling at her clothes and shaking them. I looked to see if anything else fell out, but I didn't touch her.

(See N.T. 02/03/15, pp. 33-37).

Finally, the Commonwealth rested its case with stipulated evidence establishing that neither Appellant nor Co-Defendant Clark possessed a valid license or permit to carry a firearm at the time of the above events. (See N.T. 02/03/15, pp. 70-71).[6]

---

[6] Neither Appellant nor Co-Defendant Clark testified at trial. For his case-in-chief, Co-Defendant Clark briefly called Detective Ralph Domenic, Detective Waring's partner, to discuss recent changes to the photo array process. Specifically, approximately one month prior to trial, the Philadelphia Police Department changed its photo identification process so that instead of one sheet with eight (8) smaller photographs, witnesses are presented with six (6) individual "8 x 10" photographs. (See N.T. 02/03/15, pp. 89-99).

16

Based on all the above evidence, the jury found Appellant guilty of the above-referenced offenses, and this Court subsequently imposed sentence as previously set forth.

ISSUES ON APPEAL

In its Judgment Order, the Superior Court identified the following issues for review:

> 1. Whether the evidence was insufficient to sustain a verdict of guilty [in the cases involving Ms. Hawkins, Mr. Wilson, and J.B.K.,] where the victims were unable to identify [Appellant] as the person who committed the crimes[?]
>
> 2. Whether the verdict was against the weight of the credible evidence where[,] although a statement was read into the record from Appellant regarding his supposed involvement in the robbery of Earle Wilson, there was no other valid independent or corroborating evidence[?]
>
> 3. Whether the verdict was against the weight of the credible evidence in that[,] although a statement was read into the record from Appellant regarding his supposed involvement in the robbery and assault of [J.B.K.], there was no DNA analysis, no identification or other independent or corroborating evidence[?]
>
> 4. The verdict was against the weight of the credible evidence in that[,] although a statement was read into the record from [Appellant] regarding his supposed involvement in the sexual assault of ████████, the lack of identification along with the DNA evidence at trial showed otherwise.
>
> 5. Whether the trial court imposed an illegal, excessively punitive sentence where [the] aggregate sentence (36 to 72 years) amounts to a life sentence for [] Appellant and Appellant received an illegal sentence on the indecent assault[?] The [c]ourt failed to consider the guidelines in fashioning an appropriate sentence and failed to provide adequate reasons on the record.

Commonwealth v. Riggins, No. 37 EDA 2016 (September 26, 2017) (Judgment Order), pp. 2-3

(brackets in original).

17

## DISCUSSION

At the outset it must be observed that, notwithstanding the Superior Court's Judgment Order, this Court still is of the opinion that the above issues -- *which were never presented to the Court at any point* -- are waived on appeal.

In its Judgment Order, the Superior Court observed:

> . . . Appellant was charged in six separate cases, which were consolidated for trial  Following his conviction and sentencing, he filed timely post-sentence motions in each case. Those motions were ultimately denied, and Appellant filed timely notices of appeal in each case.  The trial court then directed Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  Problematically, Appellant chose to file six different (albeit similar) Rule 1925(b) statements in each of his cases.  Apparently, the trial court did not realize that Appellant was filing multiple concise statements.  While the court ultimately drafted a well-reasoned and detailed opinion, it inadvertently erred by concluding that Appellant had waived his sufficiency of the evidence claim(s) based on the single Rule 1925(b) statement the court assessed.

Commonwealth v. Riggins, No. 37 EDA 2016 (September 26, 2017) (Judgment Order), pp. 1-2.

As the Superior Court correctly noted, Appellant's cases were consolidated into a single action for trial; accordingly, this Court issued a single Order directing Appellant to file and serve a Rule 1925(b) statement within 21 days.  Significantly, counsel for Appellant provided the Court with only one (1) Rule 1925(b) statement, setting forth eight (8) issues, each of which the Court addressed in its Rule 1925(a) Opinion.

No other Rule 1925(b) statements were ever served on the Court; thus the Court had nothing else to address in its Opinion.  Appellant's failure to serve the Court with copies of the alleged other Rule 1925(b) statements run afoul of both the letter and spirit of Rule 1925, and in fact, already has hampered review.  As such, the Court finds the above issues waived.

18

Notwithstanding waiver, in the interests of judicial and temporal efficiency, the Court shall address the merits of the above claims. For the reasons that follow, each is without merit.

## 1. Sufficiency of the Evidence

Appellant claims that the evidence was insufficient to sustain the jury's verdicts of guilty as to J.H. [redacted], Mr. Wilson and J.B.K. because they were unable to identify Appellant These claims fail.[7]

### a. Sufficiency Standard

In evaluating a challenge to the sufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the Commonwealth as verdict winner. It accepts as true all the evidence, direct and circumstantial, and all reasonable inferences arising therefrom upon which the finder of fact could properly have based its verdict, in determining whether the evidence and inferences are sufficient to support the challenged conviction. Commonwealth v. Carroll, 507 A.2d 819, 820 (Pa. 1986), Commonwealth v. Griscavage, 517 A 2d 1256, 1259 (Pa. 1986); Commonwealth v. Hopkins, 747 A.2d 910, 913 (Pa. Super. 2000).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." Commonwealth v. Jones, 874 A.2d 108, 120 (Pa. Super. 2005);

---

[7] Appellant's sufficiency claims additionally are waived due to utter lack of specificity. As the Superior Court "has consistently held":

> If Appellant wants to preserve a claim that the evidence was insufficient, then the 1925(b) statement needs to specify the element or elements upon which the evidence was insufficient. This Court can then analyze the element or elements on appeal. [Where a] 1925(b) statement [ ] does not specify the allegedly unproven elements[,] ... the sufficiency issue is waived [on appeal].

Commonwealth v. Tyack, 128 A.3d 254, 260 (Pa Super. 2015) (citations omitted). Here, Appellant does not cite which offenses, let alone elements, he is challenging on appeal. As such, his sufficiency claims are waived. See id.

see Commonwealth v. Rippy, 732 A.2d 1216, 1218-1219 (Pa. Super. 1999) (while conviction must be based on more than mere speculation, "the Commonwealth need not establish guilt to a mathematical certainty") "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Hutchinson, 947 A.2d 800, 806 (Pa. Super. 2008) (emphasis in original); see also Commonwealth v. Sneddon, 738 A.2d 1026, 1027 (Pa. Super. 1999)

"The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." Commonwealth v. Jones, 874 A.2d at 120. Thus, the decision of the trier of fact will not be disturbed where there is support for the verdict in the record. Commonwealth v. Bachert, 453 A.2d 931, 935 (Pa 1982). When assessing the sufficiency of the evidence, this Court "may not weigh the evidence and substitute [its] judgment for that of the fact-finder." Commonwealth v. Vetrini, 734 A.2d 404, 407 (Pa. Super. 1999).

"Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered " Hutchinson, 947 A2d at 806. "Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." Id

b. Application

20

Applying the foregoing principles, Appellant's sufficiency claims fail. It bears noting at the outset that Appellant's claims rest exclusively on lack of identification by the above victims. Appellant, however, overlooks the fact that he *identified himself* by admitting to participating in each of the above attacks. In that regard, he does not challenge the voluntariness of his confessions. Simply put, Appellant's confessions, combined with the detailed testimony of the above complaining witnesses, police officers, detectives, and Appellant's girlfriend, Ms. Gaines (who identified him on the surveillance videos), in addition to the DNA evidence and video surveillance -- *amply sustain the jury's verdicts in this case.* Cf. Commonwealth v. Gonzalez, 109 A.3d 711, 721, (Pa. Super.), appeal denied, 125 A.3d 1198 (Pa. 2015) (victim's uncorroborated testimony is sufficient to support a rape conviction); see also Commonwealth v. Jones, 874 A.2d at 120 (Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence).

### 2-4. Weight of the Evidence

Next, Appellant claims that he is entitled to a new trial on the allegation that the jury's verdicts, with respect to Mr. Wilson, J.B.K. and J.H. ▮▮▮▮▮▮, were against the weight of the evidence. For the reasons that follow, Appellant's claim is unavailing

#### a. Weight Standard

> Given the primary role of the jury in determining questions of credibility and evidentiary weight, [the] settled but extraordinary power vested in trial judges to upset a jury verdict on grounds of evidentiary weight is very narrowly circumscribed. A new trial is warranted on weight of the evidence grounds only "in truly extraordinary circumstances, i.e., when the jury's verdict is 'so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'"

21

Criswell v. King, 834 A.2d 505, 512 (Pa. 2003) (emphasis in original) (citations omitted). Thus, "the initial determination regarding the weight of the evidence was for the factfinder", the jury in this case, which "was free to believe all, some or none of the evidence". Commonwealth v. Habay, 934 A.2d 732, 737 (Pa. Super. 2007) (citation omitted); see also Commonwealth v. Manchas, 633 A.2d 618, 623 (Pa Super. 1993) (it is the exclusive role of the jury to evaluate the credibility of the witnesses and to resolve any conflicts in the testimony). "Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Patterson, 940 A.2d 493, 500 (Pa. Super. 2007).

A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that the evidence was sufficient to sustain the verdict. Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000) (citation omitted). In reviewing a weight claim, trial judges must not simply "reassess" the credibility of the witnesses, as they "do not sit as the thirteenth juror." Id, at 752 (citation omitted). "Rather, the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice '" Id

b. Application

22

. Instantly, having presided over Appellant's jury trial, the Court is confident that the jury's verdicts with regard to Mr. Wilson, J.B.K. and Ms. Hawkins, were soundly supported by the weight of the evidence. Nonetheless, Appellant's claims fail.

### i.-ii. Mr. Wilson and J.B.K.

With respect to the attacks against Mr. Wilson and J.B.K., Appellant claims that, *other than his confession*, there was "no other valid independent or corroborating evidence". Thus, Appellant really is challenging the sufficiency, not the weight, of the evidence  In that regard, it is well settled that a weight of the evidence claim concedes that the evidence was sufficient to sustain the verdict. Commonwealth v  Widmer, 744 A 2d ay 751. For this reason alone, Appellant's claims fail.

Even assuming arguendo that Appellant's premise is correct -- i.e., that there was no other evidence of guilt (and of course there was) -- he essentially is claiming that the testimony of Mr. Wilson and J.B.K. was not credible. However, sitting as fact finder, the jury certainly was entitled to believe or disbelieve any of the evidence, including the above victims' testimony and Appellant's confession. See Commonwealth v. Habay, 934 A.2d at 737. Indeed, it was the jury's exclusive function to evaluate the credibility of the witnesses and to resolve any conflicts in the testimony. See Commonwealth v. Manchas, 633 A.2d at 623. Appellant for that matter does not cite any conflicts in testimony, nor does the record support any  In fact, the testimony of Mr. Wilson and J.B.K. was detailed, consistent and uncontradicted, and the jury certainly was entitled to credit it. Simply put, the jury's verdict was hardly contrary to the evidence to the effect of shocking one's sense of justice.

### iii. Ms. Hawkins

23

Appellant's claim with respect to **J.H.** [redacted] is slightly different. He alleges that the verdict was against the weight of the evidence because, *other than his confession,* "the lack of identification along with the DNA evidence at trial showed otherwise." Thus, while he still essentially challenges the sufficiency of the evidence, which is of no avail, he apparently is arguing that the DNA evidence established his innocence. Of course, the DNA evidence, or any lack thereof, did no such thing.[8] Nor would it in the face of the ample competent evidence -- including but not limited to Appellant's own confession and his girlfriend's identification of him in the surveillance video walking away from **J.H.'s** [redacted] residence carrying large objects -- which the jury certainly was entitled to credit in reaching its verdict. In sum, there simply exists no basis for disturbing the jury's sound verdict.

### 5. Sentencing

Finally, Appellant claims that the Court erred by imposing an illegal sentence, and abused its discretion by imposing an excessive sentence without considering the sentencing guidelines or providing adequate reasons the record. Appellant's sentencing claims are devoid of merit.

Preliminarily, while Appellant uses the term "illegal", he does not present a claim of "illegal sentence". "'[A]n illegal sentence is one that exceeds the statutory limits.'" Commonwealth v. Berry, 877 A.2d 479, 482 (Pa. Super. 2005) (en banc) (quoting Commonwealth v. Bradley, 575 Pa 141, 834 A.2d 1127, 1131 (Pa 2003). Alternatively, "'if no statutory authorization exists for a particular sentence, that sentence is illegal and subject to

---

[8] Based on his DNA analysis, Mr. Van Alstin was able to determine that Appellant was included as a contributor to the DNA from the shoulder strap/zipper of [redacted]' handbag (recovered at her residence).

24

correction.'" Berry at 483 (quoting Commonwealth v. Lipinski, 841 A.2d 537, 539. (Pa. Super. 2004). Neither of the above applies here.

In fact, far from imposing "an illegal sentence on the indecent assault", the Court actually imposed **no further penalty** -- i.e., **no sentence at all** -- on the indecent assault conviction:

> THE COURT: ...And on 0013662-2013... There will be no
> further penalty on the robbery charge or the indecent assault

(N.T. 11/06/15, p. 129). Thus, Appellant's claim of "illegal sentence" is emphatically meritless.

Appellant's discretionary aspects of sentencing claims fare no better. It is well settled that sentencing is a matter vested in the discretion of the sentencing court and will not be disturbed on appeal absent a manifest abuse of discretion. Commonwealth v. Gribble, 703 A 2d 426, 437 (Pa. 1997). "In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." Commonwealth v. Rodda, 723 A.2d 212, 214 (Pa. Super. 1999) (en banc) (citations and internal quotations omitted)  A reviewing court must accord great weight to the sentencing court's discretion because it is in the best position to view a defendant's character, exhibition of remorse, indifference, and the general nature of the crime. See Commonwealth v. Sierra, 752 A.2d 910, 915 (Pa. Super. 2000); Commonwealth v. Brown, 741 A.2d 726, 735 (Pa. Super. 1999) (en banc).

Here, the record demonstrates that the Court considered all relevant facts and circumstances and thoroughly explained its rationale prior to imposing sentence. Specifically, in addition to Appellant's presentence investigation report and the sentencing guidelines, this Court expressly considered the violent nature and circumstances of Appellant's offenses, his SVP

25

status, the protection of the public, the gravity of the offenses, the character and condition of Appellant, his family background and support, his children, his scant work history, his passive expression of remorse, and his substantial prior record -- which, just as an adult, comprised seventeen (17) arrests, eleven (11) convictions, thirteen (13) commitments, eight (8) violations and seven (7) revocations. (See N.T. 11/06/15, pp. 82-133). Thus, Appellant's sentencing claims are utterly meritless.

## CONCLUSION

Based on the foregoing reasons, as well as those set forth in the Court's previous Rule 1925(a) Opinion, this Court's judgment of sentence should be affirmed.

BY THE COURT:

DATE: 10/10/17

SUSAN I. SCHULMAN, J

26

## PROOF OF SERVICE

I, Darece Williford, secretary to Honorable Susan I. Schulman, hereby certify that I served, on October 11, 2017 by first-class mail, postage prepaid, a true and correct copy of the foregoing Opinion on the following:

Leanne L. Litwin, Esquire
100 South Broad Street
Suite 2126
Philadelphia, PA 19110

Hugh Burns, ADA
District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

_Darece Williford_
Darece Williford